Ronald Giovanni Contreras v. John Ashcroft Good afternoon, Your Honor. I'm the attorney for the receipt of the petition, Ronald Contreras. My name is Judith Wood. All right. I think this case turns on two issues, and that is whether or not Mr. Contreras suffered past persecution in Guatemala, and whether the judge's reliance upon the State Department report which was submitted to him was proper, and whether his interpretation of it was proper. The facts are very clear. Mr. Contreras was a student activist. He was part Indian, indigenous. He also participated in various demonstrations in Guatemala protesting the persecution of indigenous people and other issues. And he co-authored a book and other articles describing what had happened to the indigenous people in Guatemala. Interestingly enough, one of the past presidents of Guatemala, Rios Montt, had initiated what is commonly referred to as the scorched earth policy, in which literally thousands of indigenous people were displaced and either killed or forced to move to the urban setting, usually Guatemala City. And Mr. Contreras' book actually addressed this phenomenon and what had happened to these indigenous people who moved from their rural homes into the urban setting. I find this a very sad case because he has had reason to, I think he may fall between various tracks. I mean, in this instance, he was one of many authors of that book, and it was years before he left. He claims he got threats around that time, but nothing ever materialized from those threats in the next, what, five, six years or something. Well, I'm sorry, Erin. There is an echo. It's hard for me to exactly discern what you're saying, but I guess I can. This is my understanding of the fact. A, he was one of 30 or 40 authors of the book. Two, he says that he had threats around the time of the book, as I recall, in a short period of time. But that was long before he left. Right. And then in addition to the business with the book, co-authoring it, you're right, he did co-author it. But also the threats, the only threats that are in the record were around the book and occurred, what, five or six years before he left. In 86 and 87. Right, he left in 91. But there was also a demonstration in which he took part in. I'm right, I'm right, but I'm trying to put, so if you say that there was no persecution there that's recognizable at this point because it's years and years, even if one would regard those threats as persecution, it was years before, then what? Then we have the demonstration in 1991. Well, he was also arrested several times. The authorities in Guatemala tried to arrest him about ten times. They actually managed to arrest him three times, and he managed to escape. So there's more than threats. There's also arrests and escape from arrests in terms of the past persecution that he endured. And then moving on, as he became older and took part in these demonstrations, which are not parades, by the way. They were characterized as parades. They're demonstrations. They're definitely political demonstrations making a definite statement as to what the people are against. In this particular demonstration, the strike of pain, it was called, but there are many such demonstrations in Guatemala, he had a disguise on, and the judge made quite a point of his having a disguise on. Well, you know, I often wear sunglasses and makeup, and people seem to recognize me anyway. He was wearing sunglasses and some makeup. I don't see that someone couldn't recognize him even so. He has a distinctive body type. He's short. He looks indigenous. And he could be recognized, even though he was wearing sunglasses and some makeup. Moreover, the people that he was demonstrating with, two other students, disappeared, and the immigration judge said, well, then maybe they just went on vacation or went somewhere. All right. That's silly. What the judge said is silly. The question is, really, whether there is authority for the proposition, and this seems to be a significant question. If you participate in a demonstration and other people participate in demonstrations but not you, there is some evidence that they were hurt or killed or something. Is that enough? If we have case watch data, that's enough. Do you mean is it enough for a finding of past persecution? Yes. Well, it isn't just participation in a demonstration. It's his indigenous identity, partially. It's his political stance. It wasn't just co-authoring this book. He also wrote other articles. He interviewed people. He was actively participating in the political process in Guatemala. And as I'm sure the Court is aware, numerous people in Guatemala who participated to this degree and more and less have been killed. Myrna Mack was a person investigating what happened to the indigenous people. She was brutally murdered. The archbishop was killed. There's been an ongoing historical legacy, unfortunately, of people who participate politically to one degree or another getting killed in Guatemala. And he was not silent. He was quite vocal. He participated. The question is whether everybody who participates politically, therefore, has a well-founded fear of future persecution. No, not at all, Your Honor. But he did receive threats, numerous threats, ten threats, indicating that he would be the next. Short period long before he left. Excuse me? Could you repeat that? Over a short period of time long before he left. Well, I think these threats were very real to him because in Guatemala these threats are often carried out. There's not much middle ground. For instance, he testified, and it's in the transcript, that his brother participated in one of these demonstrations and was knifed, actually. The judge insisted that the brother was fine, which is definitely a misstatement of the facts. But then the judge says, well, he's not dead, is he? Now, you don't have, you know, there's room between actual applying life and being dead, and somewhere in the middle of that is persecution. However, in Guatemala in particular, people usually don't inhabit that middle zone for very long. They are done away with. They are disappeared. And there have been all these graves exhumed with people as evidence of that. I mean, the government doesn't think twice about disappearing someone. So in light of the fact that he — What about the country report? Excuse me? You were going to say something about the country report. Yes. This Court has held, the Ninth Circuit has held in several cases, Ruano and Rios, and that the immigration judge was mistaken in relying on the 1996 and the 1998 country reports in Guatemala in finding that those reports indicated changed country conditions. If, in fact, this person suffered past persecution, it becomes the burden of the government to prove that the country conditions have changed fundamentally. And they couldn't have changed fundamentally in Guatemala. And this Court has held that in several cases because there were peace accords. There were ideals. There was a recognition that the indigenous people are also people and shouldn't be trampled on and subjected to genocide. However, the fact that those accords were written and everybody wanted Guatemala to live up to those accords did not mean, and there's an overwhelming amount of evidence to demonstrate, that, in fact, the country could or did live up to that ideal. Now, the courts themselves, that old source of evidence that there was continuing problems and continuing extrajudicial activity and so on, it seems to have picked out the only pieces that didn't so demonstrate. So, you know, if you get over the past persecution hump, it seems to me you're in pretty good shape. But I have a problem seeing exactly what gets over that. Well, in the matter of Ruano, you had a situation of a gentleman who had been politically active and he had been pursued. He had escaped arrest. And these are exactly the same things that happened to Mr. Contreras. Now, he wasn't a member of the government per se. He was a very young man when he lived in Guatemala. But he was very politically active, very politically vocal. He was arrested. He definitely had direct confrontation with the police in Guatemala. They, in fact, arrested him. And he escaped. The facts are almost identically parallel with Ruano, in which this court decided that the facts compelled a reversal of the immigration judge's decision and the decision of the board. So do you think Ruano is the closest in case? Pardon? Do you think Ruano is the closest in case? Yes. I see that I have five seconds left on direct. Unless you have another question, I would like to leave that for rebuttal. You're actually three seconds over. Okay. Thank you. All right. May it please the Court? I'm Susan Hauser, appearing for the Attorney General. The issue here is whether the immigration judge had a substantial basis for his decision that this petition reduced either past persecution or the well-founded fear of future persecution. In order to try to overcome that hurdle, the petitioner has consistently puffed up the facts in this case. For example, she just got up here before this panel and said that the petitioner was arrested. He was never arrested. By his own testimony in court, even if we take his testimony as true, all he claimed was that he was in a situation where he was near arrest on three occasions. He admitted that he had never once been arrested. I thought he said he was arrested and escaped. Excuse me? I thought he said he was arrested and escaped. Well, if you actually read the testimony. I did. I read the testimony. What he said is that he was rounded up with a group of people on three occasions, but he escaped before they were ever taken anywhere, before any names were taken or any of that kind of thing. Now, I wouldn't really consider that as being an arrest. I would consider that as him being in a situation where other people were arrested, but not him. Oh, you mean if they just round people up and surround them, that's not an arrest? Excuse me? That's not an arrest? No, because he wasn't and his name wasn't taken. He wasn't taken anywhere. He was never in their custody. You know, he claimed that he was with such large groups that he was able to slip away. And if somebody's downtown demonstrating in Washington, D.C., and the police surround the block and they've got 300 people contained and somebody slips away before the police take them down to the station and take their name, that's not an arrest. But this is just an example of how they're trying to pop the facts in this case to make it sound worse than it is. I'd like to talk for a minute about this so-called book. He mentions over and over again that he's a co-author of a book. This book was actually a 15-page school report that was produced by two classes in his high school when he was in high school in 1987. And there were ñ and it's in the record, so you can count that it's 15 pages. That's including the cover page and the list of students that participated. There were 33 students names listed in the report. He testified that there were 70 students who were involved in collecting information for the report. There's four students that are listed as the principals for this report. He's not even listed as one of those four students. What about the demonstration shortly before he left and the fact that two of the participants disappeared the next day? Well, that's interesting. The only thing that he claims happened to him after he graduated from high school was his participation in these few demonstrations. And there are pictures in the record that show that he disguised himself during these demonstrations. So the immigration judge had a very substantial basis for concluding that now, or in 1999 when his immigration court hearing was held, if he returned to Guatemala, the government wasn't going to persecute him based on his appearance in these demonstrations when the government wouldn't even have had any way of knowing. Well, that's ñ so he said that two of the participants disappeared. So they obviously knew who they were. Well, he said they disappeared, but these are people that he characterized as friends. He doesn't know ñ and compare this to the case in Ruano v. Ashcroft, which the Petitioner cites. In that case, the Petitioner's father disappeared, and the court looked at that fact, that his father had disappeared, and found that to be relevant and probative. In this case, he's just talking about a couple people whom he characterizes as friends. This is what I find ñ this may be a problem with the law, and I don't know whether it is, but suppose you have ten people who participate in a demonstration, and you have irrefutable evidence that two of them are sought out and killed the next day. Does the third one have to wait to get killed, or can he leave? Well, let's assume that these two people were killed by the government. We don't know why. I'm giving you a hypothetical. Let's suppose we know why. Let's suppose we know that two of the ñ that there are ten participants in an anti-government project, and the government kills two of them. Does the third one have a claim of past persecution or not, or a wealth of other future persecution? Well, any claim of past persecution, you have to look at the totality of the facts, and in such a case, Well, again, you have to look at the totality of the facts. You have to look at whether the immigration judge had a substantial basis for the decision. And in this case, one of the things that you can look at is that his brother, who he admitted in his testimony had just about exactly the same amount of political participation that he himself did. He says was attacked recently. Well, and that's another interesting example of puffing the facts. What he actually testified to was that on one occasion, somebody cut his brother's face with a knife. This ñ he didn't get this from his brother. He heard it through an aunt, supposedly. He admitted when he testified that he didn't know any details about this. But he said it was because of a demonstration. It was quite specific about that. A hurry went right after the demonstration. Well, he speculated that that was the reason, but we don't know that. We don't know who cut his brother with a knife. We don't know how serious this alleged wound was. He got it through secondhand hearsay. Also, this is just one incident that cut ñ But there's a possibility issue here. The judge didn't discredit any of this, right? I'm sorry, I didn't hear you. The judge did not discredit any of this. I understand he ñ after disappearing, he sort of ridiculed it. But he didn't discredit, for example, the evidence that ñ in fact, he ignored the evidence about the brother. Well, I think it's not a fair characterization to say that the judge ridiculed him. I think what the immigration judge said was that you can't ñ these two people, there was no evidence in the record to show that he was close to these two people or to their families. And it was merely speculation on his part that they had been taken by the government and killed. And it's true. But, you know, reading the government ñ the State Department report, the same term is used all the time. I'm sorry, I didn't ñ And it seems to have some understandable meaning in the context in which it's being used. And the assumptions are being made not just by this particular person. I'm sorry, I didn't catch the first part of that about the State ñ In fact, the State Department report talks at some length about people disappearing. And in the context of Guatemala at the time, there seemed to be a general understanding, not limited to Mr. Contreras, that people who disappear are being kidnapped, hurt, killed or otherwise harmed and not simply going to have a good time somewhere else. Well, it could be that these other two people were much, much more involved politically than he was as well. It could have been that they were much older than him. If you look at the facts of the ñ and I think it's instructive here to compare the Ruano case that the petitioner cites. In Ruano, the petitioner was a political activist. And he had an important position in a political party. He was instrumental in ñ or he was the one who arranged an important political demonstration each year. He got threats over a long period of time. He was actually cornered one time by men in a car who they thought were trying to carry out the threats. And you compare that to the situation in Lim, which was cited in our brief as well, where the petitioner had threats, but didn't have this additional information. Now, in this case ñ And after the brother, as the record says, my aunt's brother still participated in the parade. Did anything happen to him? I was told that last time after the parade, they threatened ñ they tried to threaten him with a knife and they cut his face. So that's ñ you know, that's pretty specific. Was that discredited? Well, it was secondhand. He testified that he got this information from an aunt. He testified that he never said that he got it from his brother. He also wanted it ñ And my aunts tell me things that way. If I ñ that brings an end to what's regarded as likely to be true. I'm sorry. I didn't hear that. But more than that, the judge didn't ñ the judge didn't deal with this at all. He just didn't mention it. He said the brother was fine. But the evidence is that the brother wasn't fine. Well, I think you have to look at the entire situation. What the judge said was that the brother has lived in Guatemala since these events allegedly happened in 1987 and 1989. And the brother hasn't felt any need to flee. The brother hasn't been arrested. The brother is still alive. When you say a cut on the face, I mean, what does that mean by an unknown person? The Petitioner was just speculating about who cut his brother and why. I mean, obviously, it's going to be in his interest to say that this was for political reasons. But there's no proof of that. There's absolutely no support of it at all. And hearing this story secondhand through the aunt, you know, it's obvious that the immigration judge didn't feel that it was entitled to a lot of weight. And in addition, both of his parents and his sister have lived in Guatemala since this time. Moreover, he was asked specifically about the other people that co-authored this high school article, which he persists in calling a book. And he admitted that as far as he knew, none of those people had had any problems, political problems whatsoever. And I'd like to talk just briefly about his claim that he will be persecuted based on his Indian heritage. And again, this is just another attempt to puff up the evidence. The Department of State report shows that half the people in Guatemala are of indigenous origin. He himself admitted that only his mother's name would have been identifiable as part of the indigenous population, and that he never really used that name. He didn't even have any identification to show that he ever used that name. Okay. If there are no further questions. Thank you. We'll give you a minute for rebuttal. Thank you, Your Honors. I just want to touch on a little bit of the background information in terms of the potential conditions in Guatemala at that time. An Amnesty International report was submitted at that time when the hearing was, and in that report there were specific instances of ongoing serious human rights violations in Guatemala, targeting students and people of indigenous origin. Are you relying on the country conditions to make your case in chief, or are you relying on it to rebut any changed country conditions? The country conditions that were submitted during the case in chief, Your Honor. So in other words, you're contending that these country conditions information shows a well-founded fear of future persecution, even if there was no past persecution, is that what you're showing? Exactly, Your Honor. And that that was submitted at the time, and that the State Department report was only one of many. But doesn't it mean something specific? I mean, yes, of course there were bad things happening. There were happenings of people somewhat similarly situated to Mr. Contreras. Is that enough? Yes, Your Honor. So anybody who was politically active as was Mr. Contreras and came to the United States, and I don't know the answer to this, but relied on these country conditions should get asylum. Not just politically active, but either persecuted severely and granted asylum here or killed in Guatemala. There are just volumes of descriptions of these. But I'm asking you whether the ‑‑ if we didn't think the evidence was sufficient to show past persecution, whether you're saying that given his circumstances, i.e. political action and as much persecution or adverse action as he did have, including the disappearance of his two co‑participants, and combined with the country conditions, should be enough to show a well-founded fear of future persecution, even if there wasn't fear of persecution. Is that your argument? Yes, it is. Okay. And so my question is how do we differentiate Mr. Contreras from everybody else who was in the demonstration? Is it everybody else who was in the demonstration or any other demonstration? Yes, Your Honor. I understand your question. It's not ‑‑ he's not just anybody. He's someone who is an activist, a student activist. I understand. Other people in that category. All the other people who went and prayed with him that day and every other similar prayer. No, but not all of them are journalists. Not all of them are published. Not all of them are indigenous. He was not. I mean, the published thing is a little old school. He was a high school journalist. But he's also written in various ‑‑ and his whole goal in life is to be a journalist. His line of hero was a man named Domingo, who was also a journalist, who was also murdered in Guadalajara as a result of his independent journalism. And during direct examination I asked Mr. Contreras, if you knew that this was so dangerous, why did you keep on doing this, both the demonstrations and the writing? And he does plan to be a journalist. And it's because he really does passionately feel that that is his role in this whole drama, to expose the human rights violations in that country. And the people who do that systematically get killed. Is there any evidence in the record that since he left Guatemala he's done any of this? Pardon? Since he left Guatemala, has he done any ‑‑ is there anything in the record to demonstrate that he's done any human rights work concerning Guatemala and writing anything like that? Well, whatever he did as a young man in Guatemala amounts to ‑‑ Since he left, is there anything in the record to demonstrate that he has continued to write and investigate or protest concerning Guatemala? No, because the hearing took place several years ago. I know. But he was in the country for seven or eight years between the time that he left and the time that the hearing took place. No, no, no, Your Honor. If that is all, I submit. Thank you. The matter is submitted. The stand is submitted. And we'll recess until 9 a.m. tomorrow morning.
judges: Pregerson, Fernandez, Berzon